# ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT

2007 APR 18 P 3 29

CLERK C Adams
SO. DIST. OF GA

LEE JOHNSON,      *
     *
     Plaintiff,    *
     *
     vs.      *    CV 105-125
     *
MICHAEL NIEHUS, MICHAEL   *
HUMPHREYS, RACHEL HARDIN,   *
and RONALD STRENGTH,    *
     *
     Defendants.    *

## O R D E R

Plaintiff brought the captioned case pursuant to 42 U.S.C. § 1983, alleging that Defendants used excessive force against him in violation of the Fourth Amendment. The matter is before the Court on Defendants' motion for summary judgment. (Doc. no. 14.) Having noted the existence of parallel criminal proceedings in state court,[1] on March 29, 2007, the Court ordered the parties to brief: (1) the current status of Plaintiff's criminal proceedings, and (2) the impact of those proceedings, if any, upon the pending motion for summary judgment. (See March 29th Order.)

Upon the following, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted with respect to Plaintiff's claims against Defendants Richmond County Sheriff Ronald Strength ("Strength") and Rachel Hardin ("Hardin"), and these claims are **HEREBY**

---

[1] Plaintiff has been indicted on three counts of aggravated assault. (See doc. no. 17.)

**DISMISSED**. The motion is **DENIED** with respect to Plaintiff's claims against Defendants Michael Niehus ("Niehus") and Michael Humphreys ("Humphreys"), and all further proceedings in this matter are **HEREBY STAYED** pending the resolution of Plaintiff's criminal case.

## I. BACKGROUND

### A. The Contentions of the Parties

Plaintiff contends that Richmond County Sheriff's Deputies, namely, Defendants Niehus, Humphreys, and Hardin, used excessive force against him in violation of the Fourth Amendment during the course of his arrest on October 22, 2004. (Compl. ¶ 5.) According to Plaintiff, the Richmond County Sheriff's Department has a pattern and practice of using excessive force, and Strength has both condoned this practice and failed to train his deputies with regard to the proper use of force. (Id. ¶¶ 12-14.)

The parties dispute what happened on the night of October 22, 2004. Plaintiff avers that, at roughly 11:00 p.m., as he drove his car down Milledgeville Road in Augusta, Georgia, he saw a patrol car "at the cross light between Milledgeville and Wheeless [Road]." (Pl.'s Dep. at 21.) Plaintiff pulled into a nearby convenience store to use a pay phone. (Id.) Plaintiff attempted to call his nephew. No one answered the phone, and Plaintiff got back into his car. (Id. at 23.)

2

When Plaintiff pulled out of the store, the patrol car was still "sitting at that light." (Id. at 22.) As Plaintiff drove away on Milledgeville Road, the officer driving the patrol car followed him and "threw his lights on." (Id. at 24.) Plaintiff "panicked and took off" because he was "on probation for disorderly conduct" and had "an open container in the car." (Id. at 27.)

Less than a mile down the Milledgeville Road from the convenience store, Plaintiff pulled over "in somebody's yard" on the left side of the road. (Id. at 28.) Plaintiff pulled up the driveway and "close . . . up to the house." (Id. at 29.) As Plaintiff stopped, three officers rushed up to the sides of the car, weapons drawn. (Id. at 29-30.) Two male officers stood at the driver's side, while a female officer stood on the right side of the car. (Id. at 30.)

As the officers demanded that Plaintiff open the door and get out of the car, they also began pulling on the door latches and banging on the windows; instead of unlocking the car or getting out of the vehicle, Plaintiff "panicked." (Id. at 29-31.) According to Plaintiff, as he sat in bewilderment, he heard one of the officers say "just shoot him." (Id. at 30.) Another officer said Plaintiff had "something in his hand."[2] (Id. at 62.) Plaintiff saw a "flash" and heard a shot as one of the officers on the driver's side fired at

---

[2]According to Plaintiff, he was holding a tissue because he had a runny nose. (Pl.'s Dep. at 62.)

3

him.[3]  (Id. at 30, 61.)  Plaintiff was hit in the right arm. (Id. at 31.)  Now terrified, Plaintiff backed out of the driveway and back onto Milledgeville Road; despite the presence of two police cruisers behind Plaintiff's car, Plaintiff contends that he was not blocked in and was able to back out of the driveway without hitting a patrol car or having to go "back and forth."  (Id. at 32, 50, 71, 72.) Plaintiff "took off again" with the officers in pursuit.  (Id. at 32-33.)

Plaintiff then pulled into another yard, abandoned the car, and fled on foot until he reached some "bushes."  (Id. at 33.)  As the officers found him and began "dragging" him out from under the bushes, Plaintiff lost consciousness.  (Id.) Plaintiff allegedly woke up in the hospital after having been in a coma for two months.  (Id. at 35.)  According to Plaintiff, the injuries he sustained from the gunshot have left him in chronic pain and caused permanent "paralysis." (Compl. ¶ 15.)

Plaintiff admits taking cocaine within two days of the incident.  (Pl.'s Dep. at 34.)  Plaintiff also admits that the car he was driving had only a "paper tag on it" instead of a license plate.  (Id.)  That said, Plaintiff denies taking any aggressive or provocative action towards the officers before being shot.

---

[3]Plaintiff contends that he does not know how many shots were fired during his encounter with the officers.  (Id. at 50.)

Defendants' version of the story is quite different. According to Niehus, the episode began near midnight when Niehus was sitting in his patrol car at the intersection of Wylds Road and Milledgeville Road when Plaintiff passed in front of him traveling at 60-63 miles an hour--well above the 45 mile-per-hour speed limit. (Niehus Dep. at 5.) Niehus, Humphreys, and Hardin were in the area as part of an area check by their crime suppression team. (Id.) Niehus radioed Humphreys and Hardin, who were in a nearby patrol car, to let them know that he was going to follow Plaintiff. (Id.) Niehus sped after Plaintiff and, after initially losing contact, spotted Plaintiff's car behind a closed convenience store at the intersection of Wheeless and Milledgeville. (Id. at 5-6.) Niehus drove by the store on Milledgeville as he watched Plaintiff exit his vehicle and look back up the road. (Id. at 8.) Niehus radioed Humphreys and Hardin and then turned around to return to the store. (Id.)

Meanwhile, as Hardin and Humphreys approached the store in their police cruiser, they saw Plaintiff look up and down the street before getting back into his car and pulling onto Wheeless Road.[4] (Humphreys Dep. at 4; Hardin Dep. at 6-8.) As Plaintiff sped away at "a high rate of speed" (Humphreys Aff. ¶ 9), Hardin and Humphreys followed and activated their blue lights. (Humphreys Dep. at 4-5; Hardin Dep. at 8.)

---

[4]Humphreys was driving. (See, e.g., Hardin Dep. at 10.)

Plaintiff slammed on brakes and pulled into a nearby gravel driveway on the right side of the roadway. (Humpreys Dep. at 6; Hardin Dep. at 8-9.) There was a residence on one side of the driveway, while there was a fence on the other side. (Niehus Dep. at 14.)

Hardin and Humphreys pulled into the driveway and parked their patrol car about eight to ten feet behind Plaintiff's car. (Humpreys Dep. at 6, 14; Hardin Dep. at 10.) Humphreys approached Plaintiff's side of the car, while Hardin approached the passenger side and illuminated the car with her flashlight. (Humphreys Dep. at 7; Hardin Dep. at 10.) Both Humphreys and Hardin deny drawing their weapons at this time. (Humphreys Dep. at 9-10; Hardin Dep. at 10.)

Humphreys asked Plaintiff for his driver's license; Plaintiff did not respond. (Humphreys Dep. at 8.) Humphreys also asked Plaintiff to put both his hands on the steering wheel; Plaintiff refused. (Id. at 8-9.) Both officers allegedly saw Plaintiff attempting to hide a bag of marijuana in his right hand. (Id. at 9-10; see also Hardin Dep. at 12.) Both officers also purportedly saw a bag in the front passenger seat full of white powder, which they thought was cocaine. (Humphreys Dep. at 11; Hardin Dep. at 14.)

As Humphreys and Hardin confronted Plaintiff about the suspected drugs, Niehus arrived on the scene, parked his patrol car behind the other officers' cruiser, took up position just behind Plaintiff's car, and illuminated the rear

6

window with his flashlight. (Niehus Dep. at 9-11.) Humphreys
then demanded that Plaintiff turn off his car's engine;
instead, Plaintiff reached for the "gear stick."[5] (Id. at 12;
see also Humphreys Dep. at 11.) Humphreys then reached into
the car through the partially open window on the driver's side
and tried to turn off the car. (Humphreys Dep. at 12.)
Meanwhile, Hardin began reaching through the right-rear window
(which was also open) to try to unlock the door. (Hardin Dep.
at 14.)

Humphreys then heard the car engine begin to rev as
Plaintiff put the car into reverse. (Humphreys Dep. at 12.)
Plaintiff began to back out of the driveway quickly, "slinging
gravel" and dust into the air. (Id. at 13.) As Plaintiff's
car accelerated, Hardin was thrown to the ground, while
Humphreys was briefly dragged before he could get his arm out
of the driver's side window; Plaintiff's car then struck the
nearest police cruiser, forcing Niehus to jump out of the way
to avoid being "squashed." (Id. at 13-14; see also Humphreys
Aff. ¶ 12; Niehus Dep. at 22.) The officers state that, to
their knowledge, this alleged collision caused no visible
damage to the police cruiser. (See Humphreys Dep. at 14;
Hardin Dep. at 18.)

After the collision, Plaintiff began moving forward to
execute a "three-point turn," at which point he ran into the

---

[5]According to Niehus, Humphreys demanded that Plaintiff turn off the
engine, get out of the car, and show his hands. (Niehus Dep. at 10-11.)

7

fence. (Niehus Dep. at 15, 20-21; Hardin Dep. at 18-19.)
After hitting the fence, Plaintiff started backing again--this
time nearly running over Hardin, who was standing near the
fence. (Hardin Dep. at 19-20.) As Plaintiff continued his
escape, his car allegedly swung towards Niehus; Niehus drew
his weapon, but then froze like a "deer in the headlight."
(Humphreys Dep. at 22; Niehus Dep. at 23.) Humphreys told
Niehus to fire; Niehus fired a single shot. (Humphreys Dep.
at 22; Niehus Dep. at 18, 21.) Humphreys, who was now
standing near Niehus, then also fired. (Humphreys Dep. at
17.) Niehus's shot shattered the driver's side window and
struck Plaintiff's right shoulder (Hardin Dep. at 30; Niehus
Aff. ¶ 9), while another bullet hole was found on the left-
rear of the vehicle (Humphreys Dep. at 17). Hardin did not
fire. (Hardin Dep. at 30.)

According to Niehus, Plaintiff's car narrowly missed him.
(Niehus Aff. ¶ 9.) After Plaintiff completed his three-point
turn, he then allegedly sped out of the yard and onto Wheeless
Road, nearly running into a truck on the roadway. (Niehus
Dep. at 25.) The officers got into their patrol cars and gave
chase.[6] (Id.)

Moments later, Plaintiff turned into a field near a house
and "bailed out of the car." (Id. at 28.) The officers

---

[6]As the officers got into their cars to pursue Plaintiff, a video
camera in Niehus's car was activated. Thus, the chase that ensued after
Plaintiff escaped the yard was recorded, and the videotape has been made
part of the record. (See doc. nos. 22 & 41.)

pursued Plaintiff on foot and apprehended him in a nearby briar patch. (Id. at 29; see also Niehus Aff. ¶ 12.) The officers handcuffed Plaintiff, noticed blood on him, and called an ambulance. (Hardin Dep. at 29; Humphreys Dep. at 28.) Plaintiff was treated at the Medical College of Georgia, where drug testing revealed the presence of cocaine and marijuana. (Defs.' Statement of Material Facts ¶ 11.) However, no drugs were recovered from Plaintiff's person or his vehicle. Defendant has not been charged with any drug offenses.

After the incident, Georgia Bureau of Investigation ("GBI") Special Agent S. W. Foster ("Foster"), a crime scene investigator, examined the driveway at 2315 Wheeless Road, the scene of the shooting. (Foster Aff. ¶ 4.) He recovered one brass bullet jacket, one lead bullet core, and two spent cartridge casings. (Id.) Foster also noticed many tire impressions in the dirt and grass in the area. (Id. at ¶¶ 4-6.) Upon a later examination of the patrol car driven by Humphreys, Foster found chipped paint on the left front end of the car; he also inspected Plaintiff's car and observed minor damage to the left rear bumper. (Id. ¶¶ 7-8.) Finally, a can of beer and bottle of brandy were recovered from Plaintiff's car. (Id. ¶ 9.)

In order to become deputies, Humphreys, Hardin, and Niehus had to complete a basic training course mandated by Georgia law. The officers are also required to perform a

minimum of 20 hours of training annually. (See Humphreys Aff. ¶¶ 2-4; Hardin Aff. ¶¶ 2-4; Niehus Aff. ¶¶ 2-4; Strength Aff. ¶¶ 3-4.) In addition, Humphreys is a certified instructor in "defensive tactics" (Humphreys Aff. ¶ 3), while Hardin is a field training officer for new deputies (Hardin Aff. ¶ 3).

Defendant Strength also requires his deputies (including Humphreys, Hardin, and Niehus) to complete yearly training on the use of deadly force, which includes the simulation of "shoot-don't shoot" scenarios. (Id. ¶ 5.) Strength has also promulgated policies and procedures prohibiting the use of excessive force. (Id. ¶ 7.) Officers involved in a use of force incident are required to fill out reports, and incidents involving the use of force are investigated by the Internal Affairs Division. (Id. ¶¶ 8-10.) As happened in the instant case, the GBI is also contacted and conducts its own independent investigation. (Id. ¶ 12-13.)

Finally, Strength denies that any of these procedures are constitutionally inadequate; he also specifically denies tolerating, condoning, or ignoring any pattern or practice of excessive force. (Id. ¶ 11.) Strength points out that, during his tenure as Sheriff, he has suspended three officers and terminated five others after it was determined that they used force improperly. (Id.) Strength had no personal involvement in the incident giving rise to the instant case. (Id. ¶ 13.)

10

**B.    The Pending Criminal Proceedings in State Court**

As noted *supra*, the incident giving rise to this lawsuit is also the subject of a pending prosecution in state court. On March 22, 2005, a Richmond County, Georgia, grand jury returned an indictment charging Plaintiff with three counts of aggravated assault.    (See doc. no. 17.)    According to the indictment, Plaintiff assaulted Niehus, Humphreys, and Hardin with his motor vehicle on October 22, 2004.    (Id. at 3-4.) The parties dispute whether Plaintiff intends to plead guilty to these charges.

Defendants contend that Plaintiff has agreed to plead guilty to the charges.  Defendants also note that an order has been entered in the Superior Court of Richmond County, Georgia, scheduling Plaintiff's sentencing for April 12, 2007. (See Defs.' Exs. A & B (attached to doc. no. 70).)    Plaintiff acknowledges that a hearing has been scheduled, but states that he "is not going to enter a guilty plea and will insist on trying his case before a jury."    (Pl.'s Suppl. Br. at 1.)

## II.    REQUIREMENTS FOR SUMMARY JUDGMENT

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-movant, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (<em>en banc</em>) (internal punctuation and citations omitted).

The movant has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). If the <em>movant</em> bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, . . . no reasonable jury could find for the non-moving party." <u>Four Parcels</u>, 941 F.2d at 1438. On the other hand, if the <em>non-movant</em> has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970) and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact

and that it is entitled to judgment as a matter of law. <u>Jones v. City of Columbus</u>, 120 F.3d 248, 254 (11th Cir. 1997) (*per curiam*). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. <u>Clark</u>, 929 F.2d at 608.

If--and only if--the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." <u>Id.</u> Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. <u>Anderson</u>, 477 U.S. at 249. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." <u>Fitzpatrick</u>, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1116-17. The non-movant

13

cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Fed. R. Civ. P. 56.

The Clerk has given the non-movant notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. no. 27.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.

### III. DISCUSSION

In response to Defendants' motion for summary judgment, Plaintiff has abandoned his claims against Defendant Strength. (See Pl.'s Sur-Reply at 1.) Accordingly, all claims against Defendant Strength are **HEREBY DISMISSED**. As to the claims against the remaining Defendants, the relevant law is discussed below.

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). That said, "[t]he use of excessive force in carrying out an arrest constitutes a

14

violation of the Fourth Amendment." Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002). To establish such a Fourth Amendment violation, Plaintiff must show (1) that a seizure occurred and (2) that the force Defendants used to carry out that seizure was unreasonable. Harris v. Coweta County, 433 F.3d 807, 812-13 (11th Cir. 2005).

The reasonableness inquiry is made from the perspective of a reasonable officer on the scene: the question then is whether Defendants' conduct was objectively reasonable, in light of all the facts and circumstances confronting them,[7] without regard to their subjective intent or motivation. Id. at 813 n.6. "[I]n determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th Cir. 2004). The use of potentially deadly force is reasonable:

> when an officer "(1) 'has probable cause to believe

---

[7] In this regard, the Court must pay "careful attention to the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether [Plaintiff] pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. The Court must also avoid the distorting effects of hindsight:

> [The Court is] not to view the matter . . . from the comfort and safety of [its] chambers, fearful of nothing more threatening than the occasional paper cut as [it] read[s] a cold record accounting of what turned out to be the facts. [The Court] must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.

Crosby v. Monroe County, 394 F.3d 1328, 1333-34 (11th Cir. 2004).

> that the suspect poses a threat of serious physical
> harm, either to the officer or to others' or 'that
> he has committed a crime involving the infliction
> or threatened infliction of serious physical harm;'
> (2) reasonably believes that the use of deadly
> force was necessary to prevent escape; and (3) has
> given some warning about the possible use of deadly
> force, if feasible."

Robinson v. Arruqueta, 415 F.3d 1252, 1255 (11th Cir. 2005)

(quoting Vaughan v. Cox, 343 F.3d 1323, 1329-30 (11th Cir.

2003)). Of note, the Eleventh Circuit has specifically held

that high-speed flight following a traffic offense does not

provide sufficient basis for the use of deadly force. Harris,

433 F.3d at 815.

In the instant case, Defendants contend that they are

entitled to qualified immunity. In order to show an

entitlement to qualified immunity, Defendants must

demonstrate: (1) they were acting within the scope of their

discretionary authority; and (2) they did not violate "clearly

established statutory or constitutional rights of which a

reasonable person would have known." Rodriguez, 280 F.3d at

1345 (quoting Lassiter v. Alabama A & M Univ., Bd. of

Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)). In

conducting its qualified immunity analysis, the Court

considers all the facts, even the disputed material facts, in

the light most favorable to Plaintiff. See Robinson, 415 F.3d

at 1257. In other words, the Court considers only

"[P]laintiff's best case." Id.

There is no dispute that Defendants were acting within

the scope of their discretionary authority. Thus, the question is whether, assuming Plaintiff's best case, each of the officers' actions violated clearly established law. Plaintiff contends that, after a brief chase, he was seized when Defendants pulled him over and approached his car with guns drawn. Niehus and Humphreys shot at him (without any prior warning) when he refused to unlock his doors, turn off his engine, or get out of the car. Plaintiff denies moving the car or taking any other aggressive or dangerous action until after being shot. (See Pl.'s Dep. at 29-32.) Taking Plaintiff at his word, as the Court must for the purposes of the current motion, the Court concludes that Defendant Hardin is entitled to qualified immunity, but that Defendants Niehus and Humphreys are not.

It is undisputed that Hardin never fired her weapon. Notably, Plaintiff has not even argued that she had an opportunity to intervene to prevent her colleagues' resort to force. See Jackson v. Sauls 206 F.3d 1156, 1174 (11th Cir. 2000) (explaining that "to be liable for failing to stop another officer's unconstitutional use of deadly force, the officer must be in a position to intervene"). It is also undisputed that the officers had probable cause to stop Plaintiff and to arrest him.

Even resolving all disputed factual issues in Plaintiff's favor, Hardin only: (1) pointed her weapon at Plaintiff, (2) banged on the window, and (3) tried to get into Plaintiff's

17

car when he ignored the officers' lawful commands. Plaintiff does not contend that these actions violated clearly established constitutional principles; nor could he. See Jackson, 206 F.3d at 1171-72 (holding that an officer who drew his weapon and threatened the use of deadly force during a valid investigatory stop did not act unreasonably); Courson v. McMillian, 939 F.2d 1479, 1493-94 (11th Cir. 1991) (following high speed chase, officer did not act unreasonably by drawing his gun on occupants of stopped vehicle). Simply put, Defendant Hardin is "entitled to qualified immunity on [Plaintiff's] claims of excessive deadly force because it is undisputed that [s]he did not fire at or shoot" Plaintiff. Jackson, 206 F.3d at 1173. More generally, courts readily distinguish the use of excessive force from mere displays of force which cause no injury. See, e.g., Raby v. Baptist Med. Ctr., 21 F. Supp. 2d 1341, 1350-51 (M.D. Ala. 1998). Furthermore, to maintain a § 1983 claim against Defendant Hardin, Plaintiff must offer "proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation." Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1165 (11th Cir. 2005) (citing Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)). Here, none of Defendant Hardin's actions or omissions were the proximate cause of a deprivation of Plaintiff's Fourth Amendment rights. Accordingly, Hardin is entitled to qualified immunity, and Plaintiff's claims against her are

18

**HEREBY DISMISSED.**

On the other hand, Defendant Niehus is not entitled to qualified immunity at this juncture. Although Plaintiff admits he did not obey the officers' lawful commands, under Plaintiff's best-case scenario, Defendant Niehus clearly acted unreasonably by shooting Plaintiff without warning even though he posed no danger to the officers or anyone else. Under Plaintiff's version of the events, Niehus did not have arguable probable cause to believe that Plaintiff posed a threat of serious physical harm, that he had committed a crime involving the infliction or threatened infliction of serious physical harm, or that the use of deadly force was necessary to prevent escape. Consequently, viewing the case in the light most favorable to Plaintiff, as the Court is required to do at this juncture, Defendant Niehus is not entitled to qualified immunity.[8] See Vaughan, 343 F.3d at 1332.

In arguing otherwise, Defendants miss the mark by relying upon the officers' alleged perceptions of Plaintiff's dangerous conduct in making a wild three-point turn. Plaintiff contends that he did not try to escape until after he was shot. Although the Court must consider the reasonableness of Defendant Niehus's alleged actions from his point of view, it is required to accept Plaintiff's version of

---

[8]That said, Defendants Niehus is "not foreclosed from asserting a qualified immunity defense at trial. If the jury were to accept [his] version of the facts, the qualified immunity analysis would be changed." Vaughan, 343 F.3d at 1333.

the underlying facts. Troupe, 419 F.3d at 1168.

In arguing that no shots were fired until after Plaintiff began his wild escape, Defendants implicitly ask the Court to weigh Plaintiff's credibility. In Defendants' view, Foster's affidavit proves that the erratic and violent three-point occurred and thus substantiates Defendants' version of the events. Admittedly, Plaintiff's testimony--especially that he was able to back out of the driveway without having to go "back and forth"--is difficult to square with the evidence of record; however, that does not permit the Court to disbelieve, at this juncture, Plaintiff's contention that he was shot *before* making any attempt to escape or taking any other dangerous action.

The Court reemphasizes that it is obliged to resolve this disputed fact in Plaintiff's favor. "Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003). Although the Court may reject fantastic or utterly implausible testimony at summary judgment, Plaintiff's testimony regarding the officers' conduct prior to his escape is not so outrageous or implausible that no reasonable juror could believe this portion of his testimony. Cf. Kesinger ex rel. Kesinger v. Herrington, 381 F.3d 1243, 1249 (11th Cir. 2004) (rejecting as "not substantial evidence" an eyewitness's testimony which was

20

directly controverted by physical evidence); see also Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir. 2005) (rejecting Jeffreys's testimony that officers threw him out of a third-story window as implausible because it directly contradicted multiple prior statements in which Jeffreys admitted that he had jumped out of the window).

Finally, the Court addresses whether Defendant Humphreys is entitled to qualified immunity. Under Plaintiff's best case, following Defendant Niehus's unprovoked shot, Defendant Humpheys fired and hit Plaintiff's car as Plaintiff attempted to escape. Notably, if Plaintiff had not already been seized when the officers pulled him over (not to mention when Defendant Niehus shot him), because Defendant Humphreys's shot did not stop Plaintiff's movement, it would only constitute an attempted seizure--a non-event for Fourth Amendment purposes. See Troupe, 419 F.3d at 1166-67. That said, under Plaintiff's version of the events, his escape was prompted only by Defendant Niehus's "unreasonable" resort to deadly force. Consequently, although Defendant Humphreys's shot did not actually hit Plaintiff, the Court concludes that Humphreys's resort to deadly force is subject to the same analysis already applied to Defendant Niehus.

In this regard, the fact that Defendant Humphreys only hit Plaintiff's car, instead of Plaintiff's body, does not make his conduct any more reasonable than Niehus's. If an officer's alleged use of force is clearly unreasonable, the

21

fact that the force does not actually cause physical injury is irrelevant; in fact, the absence of evidence of *any* compensable injury is not fatal to the plaintiff's claims once it has been shown that the force was clearly excessive. See <u>Slicker v. Jackson</u> 215 F.3d 1225, 1231-32 (11th Cir. 2000). In sum, Defendant Humphreys is not entitled to qualified immunity at this time.

The Court is persuaded that it should abstain from conducting further proceedings in this matter pending the resolution of Plaintiff's criminal case in the Superior Court of Richmond County. In response to the Court's March 29th Order, Defendants argue that, if Plaintiff is convicted of aggravated assault or a lesser included offense, his instant § 1983 claims will be barred by <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994).[9] On the other hand, Plaintiff argues, in summary

---

[9] In <u>Heck</u>, the Supreme Court explained:

We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

fashion, that his claims would not be barred by Heck; he also argues that a conviction would have no *res judicata* effect in the instant case.

First, although Plaintiff attempts to dispense with Heck in cursory fashion, the matter is not resolved so easily. Albeit in an unpublished opinion, the Eleventh Circuit has noted that "Heck bars civil claims under § 1983 for excessive force where recovery would undermine plaintiff's conviction for criminally resisting the arrest." See Campos v. City of Naples, 202 Fed. Appx. 381, 383 (11th Cir. Oct. 25, 2006). Also of note, at least one Court of Appeals has held that, because the use of excessive force may be raised in defense to an assault charge, a conviction for assault constitutes a Heck bar to any § 1983 claim for excessive force. See Cummings v. City of Akron, 418 F.3d 676, 682-83 (6th Cir. 2005); but see Vinyard v. Wilson 311 F.3d 1340, 1344 (11th Cir. 2002) (allowing excessive force claim to proceed despite Vinyard's guilty plea to obstructing a law enforcement officer).

Furthermore, even assuming *arguendo* that a conviction would not bar Plaintiff's claims outright under Heck, the outcome of Plaintiff's criminal case would still be relevant to the instant suit. In Willingham v. Loughnan, 261 F.3d 1178, 1183 (11th Cir. 2001), *vacated by* 537 U.S. 801 (2002), *reinstated on remand by* 321 F.3d 1299 (11th Cir.), *cert.*

---

512 U.S. at 486-87.

*denied*, 540 U.S. 816 (2003), the Eleventh Circuit considered whether Willingham's convictions for attempted murder and battery collaterally estopped her from bringing § 1983 claims for excessive force. Willingham contended in federal district court that two police officers used excessive force when they shot her outside her home. Id. at 1180. Following a jury trial in state court regarding the same incident, the plaintiff was convicted of the attempted second degree murder of one officer and the battery of the other. Id. Notwithstanding these convictions, the district court determined that the officers were not entitled to qualified immunity, and Willingham later obtained a favorable jury verdict. Id. at 1180-1181.

On appeal, the officers argued that the district court had erred in denying them qualified immunity; the Eleventh Circuit reasoned that, although neither Heck nor the principles of "issue preclusion" *necessarily* barred the plaintiff's suit, "the doctrine of issue preclusion [would] operate to limit what facts [a court could] accept were found by the jury in [the] civil case for the qualified-immunity decision." Id. at 1183. The Eleventh Circuit then went on to conclude that the officers were entitled to qualified immunity, reversing the judgment of the district court. Id. at 1188.

Thus, even assuming *arguendo* that a conviction will not raise a Heck bar to the instant suit, in the event that

Plaintiff is convicted, the Court will be required to determine the extent of the conviction's preclusive effect on the instant proceeding. See Brown v. City of Hialeah, 30 F.3d 1433, 1437 (11th Cir. 1994). At a minimum, as Willingham illustrates, Defendants Niehus and Humprheys will be entitled to re-urge their qualified immunity defense in light of the facts necessarily established by the conviction.

Accordingly, contrary to Plaintiff's arguments, the Court is not persuaded that it should simply plow ahead in the instant case, heedless of the parallel state court proceedings. Rather, "it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended." Wallace v. Kato, ___ U.S. ___, 127 S. Ct. 1091, 1098 (2007) (citing Heck, 512 U.S. at 487-88). Several courts, including the Eleventh Circuit, have held in similar circumstances that a stay is the appropriate course of action. See Jackson v. Suffolk County Homicide Bureau, 135 F.3d 254, 257 (2d Cir. 1998); Traverso v. Penn, 874 F.2d 209, 213 (4th Cir. 1989); Doby v. Strength, 758 F.2d 1405, 1406 (11th Cir. 1985) (per curiam). More generally, it is a longstanding principle of law that federal courts should abstain in order to avoid interference with ongoing state criminal proceedings. See Quackenbush v. Allstate Ins. Co., 517 U.S. 703, 730 (1996); Younger v. Harris, 401 U.S. 36 (1971).

In the instant case, if Plaintiff is convicted of

assault, this may preclude him from continuing to assert, as he has to date, that Defendants' use of force was unprovoked; thus, in essence Plaintiff

> is asking the federal court to make factual determinations identical to the factual determinations that must also be made by the state court. As such, proceeding in this case would result in simultaneous litigation of the same issues such that this court's ruling might embarrass and interfere with the state proceedings.

Stewart v. Beaufort County, __ F. Supp. 2d __, 2007 WL 1020847, at *10 (D.S.C. 2007); but see Scheuerman v. City of Huntsville, Ala., 373 F. Supp. 2d 1251, 1254-55 (N.D. Ala. 2005) (declining to stay case where Scheuerman was "being charged in state court for actions that preceded those facts forming the basis of his federal complaint"). Accordingly, all proceedings in this case are **HEREBY STAYED** pending the ultimate resolution of Plaintiff's criminal case, including, to the extent appropriate, any direct appeal or relevant state collateral review proceedings. See Traverso, 874 F.2d at 213 (explaining that stay should encompass "any relevant state collateral review proceedings").

## IV. CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's claims against Defendants Strength and Hardin are **DISMISSED**. All proceedings in this case are **HEREBY STAYED**

pending the resolution of Plaintiff's criminal case.

**THEREFORE, IT IS HEREBY ORDERED** that the Clerk of Court shall mark this action closed for statistical purposes, place the matter in a Civil Suspense File, and delete this matter from the roll of pending cases.

**IT IS FURTHER ORDERED** that the Court shall retain jurisdiction and that the case shall be restored to the trial docket upon motion by any party following the resolution of Plaintiff's criminal case, so that the case may proceed to final disposition.

**ORDER ENTERED** at Augusta, Georgia, this _____ day of April, 2007.

HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE